# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| COLONY INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 09-CV-780-TCK-TLW |
| | ) |
| DALE JACKSON, individually, | ) |
| JAMIE JACKSON, individually, | ) |
| JAMES HUNT, individually, | ) |
| ERNIE JACKSON, individually, | ) |
| J.C. & SONS WASTE | ) |
| MANAGEMENT, INC., | ) |
| | ) |
| Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above-styled declaratory judgment action was tried to the Court without a jury on January 19, 2011. Plaintiff Colony Insurance Company ("Colony"), which seeks a declaration of non-coverage under an insurance policy, appeared through counsel. Defendants Dale and Jamie Jackson appeared through counsel. Defendants James Hunt ("Hunt"), Ernie Jackson ("Ernie"), & J.C. & Sons Waste Management, Inc. ("J.C.") never appeared in this litigation and are in default.[1] After considering the testimony and exhibits admitted at trial, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52:

---

[1] Defendant Ernie Jackson testified at trial as a witness. The Court had certain concerns about Defendant Ernie Jackson's rights to participate in the trial as a party. The Court has satisfied itself that proper procedure was employed and that judgment may be entered against all non-appearing Defendants. (*See* Docs. 65, 67-70.)

**Findings of Fact:**[2]

1.  At relevant times, J.C. was a waste management company in the business of picking up, hauling away, and dumping trash. Ernie was the President and Vice-President of J.C. Ernie ran the company and did all hiring and firing for J.C. Ernie's wife, Mary Jackson ("Mary"), was the Secretary/Treasurer of J.C. Mary completed office tasks, such as processing payroll, billing clients, and maintaining client lists.

2.  J.C. serviced clients in Pawhuska, Pryor, Ponca City, and Barnsdall, Oklahoma, as well as other surrounding towns. J.C.'s clients included Indian reservation complexes, commercial businesses, and some residences.

3.  The Indian complexes and commercial businesses served by J.C. had commercial containers. Many of the residential customers were rural farmers who had "two-yard containers." At least some of J.C.'s customers did not set their trash out on a given day for collection. Thus, there was more variation in collection times than typical trash collection that takes place in urban, residential areas.

4.  J.C. owned at least two trash trucks, which were stored in Pawhuska, Oklahoma, in a warehouse owned by J.C. J.C. paid for fuel, oil, maintenance, taxes, and insurance on the trash trucks.

5.  J.C. hired individuals to collect trash using J.C.'s trucks ("collectors"). In addition to collecting and dumping trash, collectors were responsible for establishing the trash route in a given area. Ernie generally permitted collectors to establish the route and pick-up times for a given area.

---

[2] Admitted facts 1-7 in the Pretrial Order (Doc. 52) relating to jurisdiction and venue are incorporated herein by reference. Any findings of fact that are conclusions of law should be construed accordingly.

For any new customers of J.C., Ernie sent a collector to "set the contract up" so that the collector could meet the new customer and establish a pick-up time.

6. Ernie granted his collectors freedom in deciding when and how they would complete their route. Typically, the routes were completed by two collectors, so that one could drive while the other collected the trash. Generally, collectors picked up a trash truck from J.C.'s building and returned it when the route was complete. There were instances when the trucks were returned as late as 2:00 am.

7. Dale, Ernie's nephew, was hired by J.C. as a collector. There is no evidence in the record of Dale's starting date of employment or an approximate period of time he worked for J.C. In proposed Findings of Fact and Conclusions of Law submitted after trial, Dale stated that he "worked for about 6 months," (see Doc. 66 at 10), but did not cite any record testimony or exhibit in support of this assertion.

8. Dale had previously worked for the City of Pawhuska as a trash collector and had some experience in this area.

9. J.C. paid Dale $9.00/hour for collecting trash, and he was paid based upon how many hours he worked. Dale was always paid by check, which read "contract labor" at the bottom. J.C. did not withhold any taxes or benefits from Dale's earnings. Occasionally, Dale would mow the lawn outside J.C.'s business, for which he was paid $50.00 per job.

10. J.C. and Dale did not enter into a written contract. No written contract was entered into evidence, and the Court does not find credible Dale and Ernie's testimony regarding a written contract that was allegedly lost.

11.     J.C., by and through Ernie, did enter into a verbal contract with Dale, whereby J.C. and Dale agreed that Dale was an independent contractor. J.C. and Dale both had an actual belief that Dale was an independent contractor. Ernie told Dale that he needed to provide his own workers' compensation insurance. Dale did not purchase his own workers' compensation insurance. The Court finds no evidence that Dale and Ernie colluded for purposes of litigation and finds that both parties had an actual understanding that Dale was an independent contractor for J.C. Although they are relatives, Dale and Ernie have not spoken since litigation was first filed in state court regarding this accident.

12.     While he was a collector, Dale also marketed himself and was hired to complete carpentry, lawn care, and handyman jobs. If Dale had one of these types of jobs, he could choose not to haul trash that day.

13.     Dale learned the location of J.C.'s clients in a particular city or area from other collectors who had completed that route. Although Mary kept a master client list at J.C.'s office, Dale did not receive a set route, a client list, or any other written or verbal instructions from Ernie or Mary as to how or when a given route was to be completed.

14.     Dale always collected trash in J.C.'s trucks. Dale provided his own gloves and occasionally brought his own shovel or rake. Dale used his personal cell phone and was not provided a cell phone by J.C.

15.     Dale's work hours and work days fluctuated. Dale did not always dump the trash after collecting and decided whether to dump or not depending on the day.

16.     On November 27, 2007, Dale was the passenger in one of J.C.'s trash trucks being driven by another collector, Defendant Hunt. Dale and Hunt had completed the Ponca City route and were

traveling to a mechanic, who was to perform maintenance on J.C.'s trash truck. While driving to the mechanic, Dale and Hunt were in an accident, and Dale suffered injuries.

17. J.C.'s trash trucks were insured by Colony pursuant to Commercial Lines policy BA3568033 ("Policy"). Section II(B)(3) of the Policy ("Workers Compensation Exclusion") contains an exclusion for any obligation for which J.C., or J.C.'s workers' compensation insurer,[3] "may be held liable under any workers' compensation . . . law."

18. Section II(B)(4)(a) of the Policy ("Employee Exclusion") contains an exclusion for bodily injury to "an 'employee' of J.C. arising out of and in the course of (1) [e]mployment by [J.C.] or (2) [p]erforming the duties related to the conduct of [J.C.'s] business."

19. Section II(B)(5) of the Policy contains an exclusion ("Fellow Employee Exclusion") for bodily injury to "any fellow 'employee' of [J.C.] arising out of and in the course of the fellow 'employee's' employment or while performing duties related to the conduct of [J.C.'s] business."

**Conclusions of Law:**[4]

1. The Workers' Compensation Exclusion is a standard "ISO"[5] provision intended to be compatible with a state's workers' compensation laws and to "prevent the payment of double premiums and the need for unnecessary coverage by insurers." *See Brown v. Ind. Ins. Co.*, 184

---

[3] Because he believed collectors were independent contractors, J.C. did not have a workers' compensation insurer.

[4] Any conclusions of law that are findings of fact should be construed accordingly.

[5] ISO is an abbreviation for Insurance Services Offices, Inc. ISO is a national insurance policy drafting organization that develops standard policy forms and files them with each state's insurance regulators. *See French v. Assurance Co. of Am.*, 448 F.3d 693, 697 & n.1 (4th Cir. 2006).

S.W.3d 528, 532 (Ky. 2006) (internal quotations omitted) (explaining the nature and purpose of an identical provision in insurance contract).

2.   The Workers' Compensation Exclusion applies if J.C., or any workers' compensation insurer of J.C., may be held liable under Oklahoma law. Under Oklahoma law, independent contractors are not entitled to workers' compensation benefits. *See Duncan v. Powers Imports*, 884 P.2d 854, 857 (Okla. 1994) (holding that Oklahoma Workers' Compensation Court correctly denied benefits where claimant was an independent contractor rather than an employee); *Fluor Eng'rs & Contractors, Inc. v. Kessler*, 561 P.2d 72, 74 (Okla. 1977) ("The first prerequisite to jurisdiction of the State Industrial Court to award compensation is a showing that claimant was, at the time of his injury, an employee of the respondent."). Therefore, if Dale was an independent contractor of J.C. rather than an employee of J.C. under Oklahoma workers' compensation law, the Workers' Compensation Exclusion does not apply.[6]

3.   For purposes of Oklahoma workers' compensation law, employment is a "mixed notion of contract and status – contract, because it generally results from a consensual inception; status, because at times it may be imposed involuntarily as a legal consequence that attaches by force of law to the parties' conduct." *Brown v. Burkett*, 755 P.2d 650, 651 (Okla. 1988). Therefore, a workers' compensation claimant's status "is to be determined not alone from the written contract but from all the facts and circumstances adduced by the evidence." *Brewer v. Bama Pie, Inc.*, 390 P.2d 500, 502 (Okla. 1964) (finding that driver was employee notwithstanding language in contract designating him as an independent contractor).

---

[6] The parties do not dispute that, if Dale was an employee, he was acting within the scope of his employment at the time of the accident. If and to the extent necessary, the Court expressly finds that Dale and Hunt were acting in furtherance of J.C.'s business at the time of the accident.

4. As a general rule, an independent contractor is "one who engages to perform a certain service for another, according to his own manner, and method, and free from control and direction by his employer in all matters connected with the performance of the service, except as to result or product of the work." *Barfield v. Barfield*, 742 P.2d 1107, 1110 (Okla. 1987). "[T]he decisive test to determine whether one is an independent contractor or [an employee] is to ascertain whether the employer had the right to control, or purported or attempted to control, the manner of the doing of the work, and if he did have that right, or exercised it regardless of his right to do so, the relationship is that of [employer/employee]." *Id.*

5. The Oklahoma Supreme Court considers eleven factors in determining whether an individual is an employee or an independent contractor, all of which apply in the context of entitlement to workers' compensation benefits. *See Duncan*, 884 P.2d at 856 n.1. These eleven factors are:

> (a) the nature of the contract between the parties, whether written or oral; (b) the degree of control which, by the agreement, the employer may exercise on the details of the work or the independence enjoyed by the contractor or agent; (c) whether or not the one employed is engaged in a distinct occupation or business and whether he carries on such occupation or business for others; (d) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (e) the skill required in the particular occupation; (f) whether the employer or the workman supplies the instrumentalities, tools and the place of work for the person doing the work; (g) the length of time for which the person is employed; (h) the method of payment, whether by the time or by the job; (I) whether or not the work is a part of the regular business of the employer; (j) whether or not the parties believe they are creating the relationship of master and servant; and (k) the right of either to terminate the relationship without liability.

*Id.* (citing *Page v. Hardy*, 334 P.2d 782, 784-85 (Okla. 1958)).

6. The first factor – the nature of the contract between J.C. and Dale – supports a finding of independent contractor status. The Court finds sufficient evidence of an oral contract of employment, pursuant to which both parties believed Dale was an independent contractor. Ernie

7

informed Dale that Dale was not entitled to any workers' compensation coverage in performing work for J.C. Dale believed he needed to obtain his own workers' compensation coverage in order to cover on-the-job injuries but failed to do so.

7. The second factor – the right to exercise control over the details of the work – is a factor entitled to great weight and has been deemed the "decisive" factor under Oklahoma law. *Barfield v. Barfield*, 742 P.2d at 1110; *Brewer*, 390 P.2d at 502. The second factor weighs against a finding of independent contractor status because, at all times, J.C., by and through Ernie or Mary, had the right to control the work performed by Dale. Although Ernie and Dale testified that J.C. allowed collectors to exercise significant discretion in determining when and how to complete their collection routes, the proper question is whether J.C. retained the *right* to control these details of the work, not whether it actually did exercise such control. *See White Stag Mf'g Co. v. Mace*, 556 P.2d 997, 997 (Okla. 1976) ("The test is not whether the employer did in fact control . . . but whether taking into account the circumstances and the work, the employer had the right to direct and control him in the performance of his work."), *overruled on other grounds by State ex. rel. Macy v. Four Thousand Two Hundred Sixty Dollars*, 925 P.2d 50, 52 (Okla. 1996). Based on the testimony presented and all circumstances regarding the work setting and relationship between J.C. and its collectors, the Court finds that J.C. could remove the collectors' discretion at any given time, dictate their route, and dictate their collection methods and times. Importantly, J.C. could also take away or restrict use of the trash trucks, rendering it impossible for the collectors to complete the work at all. For example, specific to this accident, J.C. could have directed Hunt and Dale to forego maintenance on the truck, obviating the purpose of their trip. In short, although J.C. allowed Dale and other collectors a certain level of discretion and flexibility in collecting the trash, collectors were

not hired to perform their work "free from control and direction" by J.C. Instead, all tasks completed by collectors were subject to control and direction by J.C., should it have elected to exercise such control as to any detail of the work.

The Court finds Plaintiff's Exhibit 13, which is an agreement between J.C. and Hunt dated June 13, 2008, relevant to J.C.'s treatment of collectors, including Dale. Although this agreement describes Hunt as "contract labor" and instructs Hunt that "[J.C.] does not carry insurance you carry your own," it is also entitled an "Employee Confidential Agreement" and uses the term "employee" throughout. More importantly, it discusses J.C.'s right to control details of Hunt's work, such as Hunt's obligation to bring any "personnel issues to the main office" and to refrain from using the company-issued cell phone for personal reasons. This agreement is therefore distinguishable from some type of "Independent Distributor Agreement" or other document reflecting a clear attempt by an employer to establish an independent contractor relationship. *Cf. Duncan v. Powers Imports*, 884 P.2d 854, 854 (Okla. 1994) (finding that express, written agreement entitled "Independent Distributor Agreement" weighed in favor of finding independent contractor status). In the Court's view, J.C.'s contract with Hunt supports a finding of employee status because it reveals J.C.'s right to control the collectors and J.C.'s requiring collectors to follow general rules of conduct and confidentiality established by J.C. while completing its work.

8.  The third factor – whether or not Dale was engaged in a distinct occupation or business and whether he carried on such business for others – weighs against a finding of independent contractor status. Dale did not own a trash truck, did not own a trash-hauling business, and did not complete trash-hauling tasks for any other company at the time of his employment with J.C.

9

9. The fourth and fifth factors – whether the work is usually done under the direction of the employer or by a specialist without supervision and the skill required in the particular occupation – weigh against a finding of independent contractor status. The type of work at issue – trash collecting – is typically done under the direction of an employer and does not require particularized specialized skills or knowledge.

10. The sixth factor – whether the employer or the workman supplies the instrumentalities, tools and the place of work for the person doing the work – weighs against a finding of independent contractor status. The most important tool is the trash truck, which is owned by J.C. While Dale did supply his own gloves and other small tools, the work could not be effectively completed without the trash truck provided by J.C.

11. The seventh factor – the length of time for which the person is employed – is neutral because neither party submitted evidence in this regard.

12. The eighth factor – whether the method of payment is by the time or by the job – weighs against a finding of independent contractor status. Dale was paid an hourly rate of $9.00 per hour for his trash-hauling work and was paid in accordance with how many hours he worked.[7] While Ernie testified that Dale was paid by the job and the record reflects some $50.00 payments to Dale, these were payments for lawn mowing and not trash collection.

13. The ninth factor – whether or not the work is a part of the regular business of the employer – weighs against a finding of independent contractor status. J.C.'s business was trash collection, and

---

[7] In finding that Dale was paid by the hour, the Court has given little weight to Plaintiff's Exhibit 8, which is an unsigned memorandum regarding Dale's being paid $720.00 every two weeks. The Court's conclusion is based primarily on Dale's testimony.

Dale's primary duty was trash collection. Further, the accident occurred en route to taking the trash truck in for maintenance, which is in furtherance of the trash collection business.

14. The tenth factor – whether or not the parties believe they are creating the relationship of master and servant – weighs in favor of independent contractor status. *See supra* Conclusion of Law No. 6.

15. The eleventh factor – the right of either party to terminate the relationship without liability – weighs against a finding of independent contractor status. Ernie had the right to fire Dale at any time, and Dale had the right to quit at any time. *See Brewer*, 390 P.2d at 502 ("An employee may quit or be summarily discharged but an independent contractor remains under a legal obligation to complete his undertaking.").

16. In sum, two factors weigh in favor of independent contractor status, and the rest weigh against independent contractor status. The two factors that weigh in favor of independent contractor status – the nature of the contract and the parties' actual beliefs – both stemmed from Ernie's opinion that Dale was an independent contractor and Ernie informing Dale that he was an independent contractor.

The other relevant factors – which examine the actual relationship and work setting rather than the parties' beliefs or labels – indicate an employer/employee relationship. Under these circumstances, the two factors weighing in favor of independent contractor status are of limited weight. As argued by Colony and for obvious policy reasons, an employer's declaration of independent contractor status does not make it so. Even a good-faith belief by an employer of independent contractor status, which is then communicated to his workers, is not dispositive. In this case, the other factors examining the reality of the relationship tip decidedly in favor of employee

status. Therefore, considering all relevant factors, the Court concludes that the relationship between J.C. and Dale was that of an employer and employee.

17. Of the many Oklahoma cases discussing whether an individual is an employee or independent contractor for purposes of workers' compensation benefits, two are most critical to the Court's decision. In *Brewer v. Bama Pie, Incorporated*, 390 P.2d 500 (1964), the parties had a written contract designating that a delivery driver ("driver") would "purchase" the company-owned truck from the company by making weekly payments from his compensation as a driver and assume the risk of damage to the truck. The Oklahoma Supreme Court held that the driver was nonetheless an employee because, *inter alia*, the company still had the authority to dictate the price of the product, change the route, or terminate the driver's services altogether without incurring liability. *Id.* at 502. This case is similar in that J.C. had the right to exercise control over Dale's work, rescind all contracts with customers on Dale's route, and terminate Dale at any time. Further, J.C. owned the trash truck, with no special buy-back or other situation attempting to make Dale the eventual owner of the vehicle. The only distinguishing facts in this case are that Dale had more discretion than the driver in Bama as to whether, when, and in what manner to complete his route. However, as explained above, the critical question is the *right* to control, which the Court concludes that J.C. retained at all relevant times.

18. In *C&H Transportation Company v. McLaughlin*, 434 P.2d 229 (Okla. 1967), the purported employer ("company") owned and operated large trucks for the hauling of oil-field equipment. Some of its customers occasionally needed to quickly transport a small item. To accommodate this, the company made arrangements with the purported employee ("driver"). The driver owned his own truck, was on 24-hour call, was required to advise the company where he could be located, was

occasionally called directly by the company's customers, and was paid by the mile. For the three years prior to his injury, the driver's only job was hauling for the company, although he was not required to limit his activities. The company did not make withholdings from the driver's earnings. The Court first acknowledged that the driver being paid by the mile, furnishing his own vehicle, and paying his own taxes weighed in favor of independent contractor status. *Id.* at 233. However, the Oklahoma Supreme Court held that the driver was an employee because, *inter alia*, (1) the company had the right to terminate him at any time, (2) the driver did not do hauling for others, (3) only the company would be liable for any delayed or damaged delivery being made by the driver, and (4) the company had a *right* to tell the driver whether to go, where to go, and when to go, even where customers called the driver directly and the company did not actually exercise this right. *Id.* at 233-34. Similar to Dale, the driver had significant freedom in that customers called him directly, and he made the delivery by his chosen route. However, like J.C., the company at all times had the right to tell the driver whether and how to complete a certain task, resulting in an employer/employee relationship. The fact that J.C. owns the trash truck makes this an even stronger case for employer/employee status than that present in *McLaughlin*.

19. Oklahoma cases finding independent contractor status are distinguishable from this case in at least three important respects – namely, the existence of a clear and unambiguous written agreement, the contractor's provision of his own vehicle and equipment, and payment on a per-job or commission basis. *See Duncan*, 884 P.2d at 856-57 (under "Independent Distributor Agreement," sales person was allowed to sell company's products during any hours, to set his own prices, was "free of control" from company, chose his sales area, provided his own vehicle, and was paid solely on a commission basis); *Express Bus, Inc. v. Okla. Employment Sec. Comm'n*, 157 P.3d 1180, (Okla.

Civ. App. 2007) (under "Independent Contractor Agreement," driver made deliveries of school buses from factories in Oklahoma to locations throughout U.S., driver supplied all materials, tools, and equipment required to make the deliveries, driver had a particular license and was free to do work for other entities, and driver was paid on a per-job basis depending on the miles driven);[8] *Sawin v. Neace*, 97 P.2d 27, 31 (Okla. 1939) (holding that Sears delivery person who provided his own truck was independent contractor where Sears, although it controlled goods in the truck, had no right to control the manner of driving the truck or repairs on the truck).

20. Because Dale was J.C.'s employee for purposes of Oklahoma workers' compensation law, the Workers' Compensation Exclusion applies. Although Dale was a passenger in a trash truck covered by the Policy at the time of the accident, Dale is not covered by the Policy because J.C. or its insurer, had an insurance policy been purchased, may be held liable for such injuries under Oklahoma workers' compensation law.

21. J.C.'s failure to carry workers' compensation insurance – and Dale's failure to recover any workers' compensation benefits – does not prevent application of the Workers' Compensation Exclusion. *Johnson v. Marciniak*, 231 F. Supp. 2d 958, 959-60 (D.N.D. 2002) (holding that identical workers' compensation exclusion precluded coverage, regardless of whether any workers' compensation benefits are actually paid to the injured party) (explaining that an employer/insured "should not be rewarded for failure to obey workers compensation law" and that if employer would have obtained workers' compensation insurance, any tort claim against it for an employee's on the

---

[8] *Express Bus* provides at least some support for Dale's position because the court discussed the driver's ability to decline delivery offers, choose delivery routes, and make driving decisions. *See id.* at 1184. Dale also had a degree of freedom in the manner of completing his trash-hauling activities. He also could decline to complete a route that day in order to work as a handyman. However, the distinctions discussed above are important ones, and the weight of factors in this case weighs in favor of employee status.

job injury would have been barred); *Brown*, 184 S.W.3d at 534-35 ("Every jurisdiction that has considered this issue has held that a "workers' compensation" exclusion in a policy of commercial automobile or CGL insurance . . . precludes coverage when the insured employer is exposed to tort liability solely because of its failure to procure a policy of workers' compensation insurance.").

22. The Court does not reach the questions of whether the Employee Exclusion or Fellow Employee Exclusion also apply to preclude coverage.

SO ORDERED this 27th day of May, 2011.

*[signature]*
TERENCE C. KERN
United States District Judge